## United States District Court
## Northern District of Alabama
## Southern Division



| | |
|---|---|
| Wanda H. Hubbard, | ] |
| | ] |
| Plaintiff(s), | ] |
| | ] |
| vs. | ] CV-02-CO-1440-S |
| | ] |
| Protective Life and Annuity | ] |
| Insurance Company, | ] |
| | ] |
| Defendant(s). | ] |

### Memorandum of Opinion

**ENTERED**
JUN 0 5 2003

### I. Introduction.

Presently before the court is a motion for summary judgment, filed by the defendant on April 17, 2003. [Doc. # 27.] The issues raised therein have been fully briefed by the parties, and are now ripe for decision. Upon due consideration, the court is of the opinion that the motion is due to be granted in all respects.

### II. Facts.[1]

The plaintiff, Wanda Hubbard ("Ms. Hubbard"), a forty-five year old female, was employed by defendant Protective Life Corporation ("Protective") from July 15, 1996, to October 31, 2001. At the time she was hired by Protective as a Systems Analyst in the Broker Dealer Department, Ms. Hubbard was thirty-eight years old. Ms. Hubbard's duties as a

---

[1] The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).



Systems Analyst were to manage and write the applications associated with the broker dealers. In 1998, Ms. Hubbard was promoted to the position of Senior Systems Analyst.

In December 1999, Ms. Hubbard was laterally transferred to the Internet team, which consisted of three team members at that time. In her position on the Internet team, Ms. Hubbard was responsible for assisting in the research, analysis, and development of Internet initiatives, and for performing efficient, effective, and accurate coding to implement Internet initiatives. At that time, Chris Jones ("Mr. Jones"), Vice President of Marketing, was the temporary supervisor of the Internet team. Mr. Jones supervised the Internet team in order to determine the business direction the team should take. Beginning in October 2000, the Internet team did not take on new projects and stopped working on some active projects, but Ms. Hubbard testified that Mr. Jones repeatedly told her that there would be plenty of work to perform in the future. Because there was a shortage of work in the department, Ms. Hubbard spent time creating projects to work on in order to learn particular techniques or technological applications. Additionally, she spent a substantial amount of time researching technology.

In late 2000, Protective terminated one member of the Internet team, leaving the Internet team with only two members. On January 3, 2001, Todd Miranda ("Mr. Miranda"), a male in his late twenties or early thirties, was hired as Assistant Vice President of Internet Development and became the leader of the Internet team, under Mr. Jones's supervision. As Assistant Vice President of Internet Development, Mr. Miranda supervised the personnel within the Internet team, assessed the effectiveness of the team, determined the team's direction, and maintained administrative functions. Mr. Miranda used the first couple of

months of his employment to observe team members and assess how they would fit into his plans for moving the Internet team forward.

In mid-May 2001, Mr. Miranda had a meeting, characterized by the plaintiff as a mid-year review, with Ms. Hubbard. At that time, Mr. Miranda discussed problems with Ms. Hubbard's abilities and performance. She testified that he told her she did not have the skills necessary to perform her job duties. Ms. Hubbard asked Mr. Miranda for additional work and further training in the areas he discussed with her, but he denied her request.

Based on his observations of the Internet team, Mr. Miranda decided to adjust some job titles to reflect the actual structure of the Internet team. Specifically, on May 31, 2001, Ms. Hubbard's job title was changed from Senior Systems Analyst to Web Developer. The Web Developer's primary functions were to write code, test units, and troubleshoot the system. Mr. Miranda made this change because, in his opinion, there was no need for a Systems Analyst given the size of the company's Internet system. Ms. Hubbard's salary and pay range did not change as a result of the change in job titles, nor was her work load affected. However, she viewed the change as a demotion. She claims that Mr. Miranda told her that what was previously known as a Senior Systems Analyst would be called a Senior Web Developer, and the Systems Analyst position would now be called Web Developer. Mr. Miranda claims that the Senior Systems Analyst position became the Web Developer position.

In the Spring of 2001, Mr. Miranda began to search for another Web Developer. In late May 2001, Chris Smith ("Mr. Smith"), a male in his twenties, was hired by Protective as a Web Developer in the Internet team. Because Mr. Smith had a particular expertise in the

Internet and a strong technical background,[2] Mr. Miranda decided to designate Mr. Smith as a Senior Web Developer. As a Senior Web Developer, Mr. Smith was responsible for building the website and developing web applications. Ms. Hubbard believes that Mr. Smith was hired to replace her. Ms. Hubbard testified that after Mr. Smith was hired, Mr. Miranda informed her that they would have technical meetings once a week to plan the future of the department.[3] Ms. Hubbard does not know whether or when these weekly meetings occurred, nor does she know who attended them. Ms. Hubbard also testified that she observed Mr. Miranda at Mr. Smith's cubicle discussing business-related issues. However, Ms. Hubbard alleges that she was not included in these discussions or meetings. Additionally, Ms. Hubbard testified that at some point, she requested that she be permitted to attend a training class regarding new technology that would be used at corporate headquarters, but Mr. Miranda denied that request. Ms. Hubbard testified that someone told her that both Mr. Miranda and Mr. Smith went to that training class.

Throughout the Summer of 2001, Mr. Miranda continued to work to develop the Internet team. Based on his interactions and conversations with Ms. Hubbard, Mr. Miranda grew increasingly concerned that she was not sufficiently knowledgeable in particular areas of programming that would be critical to the team once it had fully developed. During this time, he had several conversations with Ms. Hubbard in which he shared his concerns about her knowledge and performance, particularly with respect to her knowledge of the

---

[2] Prior to coming to Protective, Mr. Smith co-owned and worked as Webmaster and Administrator at an Internet Service Provider. Additionally, he had several years' experience as the Director of Web Development at a media company.

[3] Mr. Miranda testified that technical meetings occurred randomly, rather than once a week.

Windows operating system. By September 2001, Mr. Miranda was told that there would not be as many resources available to the Internet team as he had initially envisioned; in fact, he learned at that time that the team would be "drastically smaller." (Miranda Dep. 32.) As a result thereof, Mr. Miranda decided, among other things, that he would have only one Web Developer, Senior or otherwise, on the Internet team.

Sometime in September 2001, Ms. Hubbard spoke to John Faure ("Mr. Faure"), a Human Resources representative at Protective, about her concerns about working with Mr. Miranda. Specifically, she complained that she was not being allowed to attend meetings and had not been given any work. In fact, Ms. Hubbard testified that between January and May or June 2001, she worked on only two projects that took less than twenty hours total to complete. Morever, she expressed her concerns over the fact that she had heard that Protective planned to hire another Senior Web Developer, when there was not enough work to keep the current team members busy.[4] Ms. Hubbard complained that Mr. Smith and Mr. Miranda were friends and that they were the same age, and that Mr. Smith was getting work from Mr. Miranda, but she was being excluded. Ms. Hubbard asked Mr. Faure to help her find another job within the company.

Between September 13 and September 18, 2001, Mr. Miranda gave a coding assignment to both Ms. Hubbard and Mr. Smith. The product from the assignment would result in a piece of code that was to be implemented in an application. The assignment was objective and was designed to help Mr. Miranda assess which developer was less essential

---

[4] Mr. Miranda denies that there was ever a plan to hire another Web Developer or Senior Web Developer, and in fact, no one has been hired into either of those positions since Ms. Hubbard's termination.

to the team. He estimated that the assignment would take eight hours to complete. Mr. Smith asked one question about the assignment and submitted his response in three days; Ms. Hubbard asked three questions, the answers to which Mr. Miranda considered to be rudimentary knowledge she should have had, and turned in her response a week after Mr. Smith submitted his response.

On October 1, 2001, Mr. Faure and Mr. Miranda met with Ms. Hubbard and informed her that her position was being eliminated and that she would be terminated on October 31, 2001, unless she was able to secure another position within Protective. Mr. Miranda testified that Ms. Hubbard's position was eliminated because the department was being restructured, and Mr. Miranda decided to have only one employee in each position.

Ms. Hubbard spoke with Mr. Faure again in October 2001, sometime after she had been notified of the elimination of her position, and complained about her job situation. Ms. Hubbard testified that she told Mr. Faure on this occasion that she had been discriminated against on the basis of her sex and age. Because Ms. Hubbard could not find an available position within Protective for which she was qualified, her employment with Protective was terminated on October 31, 2001. Ms. Hubbard was forty-four at that time. No one has been hired to replace her in the position of Web Developer.

Ms. Hubbard filed a charge of discrimination with the EEOC on November 2, 2001, alleging discrimination based on her gender and age, as well as retaliation. On March 14, 2002, Ms. Hubbard received her notice of right to sue from the EEOC, and she filed her complaint in the instant action on June 12, 2002. The complaint alleges three claims against

Protective:[5] (1) a claim alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17; (2) a claim alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634; and (3) a claim that she was terminated in retaliation for protesting discriminatory treatment, in violation of Title VII and the ADEA. Protective filed the instant motion for summary judgment on April 17, 2003. [Doc. # 27.]

### III. Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

---

[5] Ms. Hubbard voluntarily dismissed a fourth claim on August 5, 2002. [Doc. ## 13-14.]

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

### IV. Discussion.

#### A. Disparate treatment claims under Title VII and the ADEA.

##### 1. The legal framework.

Ms. Hubbard has alleged that she was discriminated against in the terms and conditions of her employment on the basis of her gender and her age. Because the same legal analysis applies to both Title VII claims and ADEA claims, the court will analyze the disparate treatment claims under the statutes together. *See Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 n.6 (11th Cir. 2001).

To prevail on her disparate treatment claims, Ms. Hubbard must establish that Protective intentionally discriminated against her because of her gender and/or age. "Whether an employer intentionally discriminated against an employee ... is a question of fact, which may be proved either through direct or circumstantial evidence." *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (citation omitted). Because Ms. Hubbard has not alleged any facts to support a direct evidence case, she must prove her

case through circumstantial evidence, using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* analysis, the plaintiff creates a rebuttable presumption of discrimination by proving a prima facie case of discrimination, which consists of proof that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) a similarly situated employee outside the protected class who engaged in the same or similar misconduct did not suffer a similar adverse employment action. *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1336 (11th Cir. 2000) (citations omitted). The defendant can rebut the presumption of discrimination by producing evidence of a legitimate, non-discriminatory reason for the challenged employment action. *Alexander*, 207 F.3d at 1336. Once the presumption is rebutted, the defendant is entitled to summary judgment unless the plaintiff proffers evidence from which a reasonable factfinder could conclude that the reason articulated by the defendant is mere pretext for discrimination. *Id.*

### 2. **Non-termination claims.**

Protective does not dispute that Ms. Hubbard is a member of a protected class – she is a female over the age of forty – or that she was qualified to perform her job. Protective argues that, other than her termination, Ms. Hubbard was not subjected to any actionable adverse employment actions. Ms. Hubbard claims that the following events constitute adverse employment actions for purposes of Title VII and the ADEA: (1) she was demoted and replaced by a younger male; (2) she was excluded from meetings that a younger male co-worker attended; (3) she was excluded from working on assignments that her younger

male co-worker was allowed to perform; (4) she was denied training; and (5) she was given a negative mid-year review by Mr. Miranda. Following a brief discussion of the law regarding adverse employment actions, the court will address each alleged adverse employment action in turn.

The Eleventh Circuit has held that to qualify as an adverse employment action, the employer's action "must at least have a tangible adverse effect on the plaintiff's employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). Moreover, the plaintiff must demonstrate "a *serious and material* change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239 (emphasis in original).

### a. Alleged demotion.

Ms. Hubbard alleges she was demoted when her title changed from Senior Systems Analyst to Web Developer. She claims that this constitutes an adverse employment action because Mr. Miranda told her that the position previously known as Senior Systems Analyst would be called Senior Web Developer, while her new title, Web Developer, correlated with the previous position of Systems Analyst.[6] However, even if the court accepts as true that Ms. Hubbard's job as Web Developer was lower in rank in the corporate structure than her previous position as a Senior Systems Analyst, it is undisputed that neither Ms. Hubbard's salary nor her salary range were affected by the title change. Moreover, Ms. Hubbard admitted that her job duties were the same following the title change. Because Ms. Hubbard does not allege "at least a tangible adverse effect on [her] employment" as a

---

[6] According to Mr. Miranda, who made the decision to change the job titles to more accurately reflect the duties performed by the team members, the Senior Systems Analyst position translated into the Web Developer position after the change, and the Senior Web Developer position was not created until Mr. Smith was hired.

result of the change in job titles, she cannot establish that she suffered an adverse employment action when her job title changed from Senior Systems Analyst to Web Developer. *Davis*, 245 F.3d at 1239. As such, she cannot establish a prima facie case of discrimination as to her claims based on her alleged demotion, and summary judgment as to those claims is due to be granted.

### b.   Exclusion from meetings.

Ms. Hubbard alleges that she suffered an adverse employment action when she was not permitted to participate in technical meetings and discussions with Mr. Miranda. Assuming these meetings did occur and Ms. Hubbard was excluded from them, Ms. Hubbard offers no evidence that she experienced any tangible adverse effects as a result of being excluded from the meetings, much less that her exclusion from meetings resulted in a serious and material change in her employment. *See Davis*, 245 F.3d at 1239. Therefore, she cannot establish a prima facie case of gender or age discrimination based on her exclusion from meetings, and summary judgment as to her claims based on the alleged exclusion is due to be granted.

### c.   Lack of assignments.

Ms. Hubbard alleges that she was not given work assignments while work assignments were given to a younger male co-worker. As with the two allegations above, Ms. Hubbard has not demonstrated that a decrease in work assignments, which began as early as October 2000, resulted in any tangible adverse effects, nor has she demonstrated that she suffered a serious and material change in her employment as a result of the lack of assignments. While it is clear that fewer assignments resulted in some change in the

conditions of her employment, because Ms. Hubbard's earnings were not impacted, the court cannot conclude that the change was serious and material.

Moreover, even if the court concluded that a decrease in the number of assignments Ms. Hubbard received constituted an adverse employment action for purposes of Title VII and the ADEA, Ms. Hubbard cannot establish the fourth element of her prima facie case – that a similarly situated individual outside the protected class was treated more favorably than her. While Ms. Hubbard generally avers that Mr. Smith was being assigned work when she was not, she has not presented any evidence regarding specific assignments to which Mr. Smith was assigned and from which she was excluded. Without any evidence that someone outside her protected class was treated more favorably, and given that a decrease in work assignments not resulting in any tangible harm is not an adverse employment action, Ms. Hubbard fails to make her prima facie case with respect to a decrease in work assignments. As such, summary judgment is due to be granted as to her claims based on this alleged adverse action.

### d. Denial of training.

Ms. Hubbard claims that she was denied training. She has alleged that she asked Mr. Miranda for more training in her mid-year review, which he denied, and she has alleged one specific instance in which she claims she requested to attend a training class but was not permitted to do so. She testified that someone later told her that Mr. Miranda and Mr. Smith attended that class. Beyond this testimony, Ms. Hubbard has offered no evidence regarding when this training class took place, the nature of the training, or how she was negatively affected by being denied the opportunity to attend. As to her request during the

mid-year review, she has adduced no evidence to suggest that there were specific training opportunities Mr. Miranda denied her. Without substantial evidence that the denial of training opportunities had a serious and material effect on her employment, Ms. Hubbard cannot establish a prima facie case of discrimination on her claims premised on the denial of training, and summary judgment as to those claims is therefore appropriate.

### e.  Negative mid-year review.

Ms. Hubbard alleges that her meeting with Mr. Miranda in mid-May 2001 constituted a negative mid-year review. She further alleges that no other employees had mid-year reviews in 2001, and that her review constitutes an adverse employment action. However, the Eleventh Circuit has made it clear that "[n]egative performance evaluations, standing alone, do not constitute adverse employment action[s]." *Lucas v. W. W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001). *See also Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1242 (11th Cir. 2001) ("[T]he loss of prestige or self-esteem felt by an employee who received what he believes to be an unwarranted job criticism or performance review will rarely – without more – establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause."). Without evidence of some tangible effect on her employment as a result of the job criticism in question, Ms. Hubbard has failed to establish the third element of her prima facie case of discrimination as to her claims based on the mid-year review. As such, summary judgment is due to be granted on these claims.

### 3.  Termination claims.

It is clear that termination is an adverse employment action; therefore, to establish a prima facie case of discrimination on her termination claims, Ms. Hubbard must prove the

fourth element thereof. In the context of a termination claim, the plaintiff can succeed by proving either that a similarly situated person outside the protected class was treated more favorably than her, or that she was replaced by someone outside the protected class. *See Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995). It is undisputed that no one has been hired as a Web Developer since Ms. Hubbard was terminated; thus, she cannot establish that she was replaced by someone outside the protected class. Instead, Ms. Hubbard alleges that Mr. Smith, a similarly situated employee outside the protected class, was treated more favorably than her in that he was not terminated.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified on other grounds by* 151 F.3d 1321 (11th Cir. 1998). Indeed, the plaintiff must show that she is "similarly situated in all relevant aspects" to the putative comparator. *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001). The court is of the opinion that Ms. Hubbard cannot establish that a similarly situated employee was treated more favorably than her with respect to her termination.

Ms. Hubbard alleges that Mr. Smith was similarly situated to her but was not terminated. However, there is no evidence to suggest that Mr. Miranda experienced the same dissatisfaction with Mr. Smith's performance that he did with Ms. Hubbard's. In fact, the evidence demonstrates that when given the same assignment to complete in September

2001, Mr. Smith took only three days to complete it, while Ms. Hubbard's response was not submitted until a week after Mr. Smith submitted his. Mr. Miranda decided to downsize the Internet team, and due to their performance on the assignment, he chose to retain Mr. Smith rather than Ms. Hubbard. Given that Ms. Hubbard took a week longer to complete the assignment than Mr. Smith did, Ms. Hubbard cannot establish that she and Mr. Smith were similarly situated in all relevant aspects of their job performance. As such, he is not a proper comparator, and she therefore cannot establish the fourth element of her prima facie case with respect to her termination claims. Summary judgment as to these claims is due to be granted.

### B.     Retaliation claim.

To establish a prima facie case of retaliation under Title VII and the ADEA, the plaintiff must show: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) a causal connection between the adverse action and her protected expression. *Lucas*, 257 F.3d at 1260. Protective has conceded, for purposes of the motion for summary judgment, that Ms. Hubbard engaged in protected expression when she complained to Mr. Faure in September 2001. Protective has also conceded that Ms. Hubbard's termination constitutes an adverse employment action. Thus, the court must determine whether Ms. Hubbard can establish a causal connection between these two events. To establish the requisite causal connection, the plaintiff must prove only "that the protected activity and the negative employment action are not completely unrelated." *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571-72. Ms. Hubbard relies on

the temporal proximity between her conversation with Mr. Faure in September and her termination in October to establish the requisite causal link.

However, while the plaintiff's burden to establish the causal connection is a light one, the timing of an adverse action is not dispositive, but is rather only "one factor among the total circumstances." *Booth v. Birmingham News Co.*, 704 F. Supp. 213, 216 (N.D. Ala. 1988). *See also Thurman v. Robertshaw Control Co.*, 869 F. Supp. 934, 942 (N.D. Ga. 1994) ("The mere presence of a temporal sequence which shows the discharge following the [protected activity] is, in and of itself, not sufficient to substantiate the requisite causal connection."). Ms. Hubbard cannot rely solely on the timing of her termination to establish the requisite causal link, because her own intervening conduct – namely her performance on the assignment she and Mr. Smith were given in September – severs any inference of a causal connection raised by the temporal sequence of events. *See, e.g., Gaston v. Home Depot USA, Inc.*, 129 F. Supp. 2d 1355, 1376-77 (S.D. Fla. 2001) (inference of causal connection "severed" where evidence showed that the defendant received multiple employee complaints about the plaintiff's conduct, both before and after the plaintiff made three discrimination complaints). Because Ms. Hubbard cannot establish a causal connection between the protected activity in which she engaged and her termination, she has failed to make a prima facie case of retaliation. As such, summary judgment as to her retaliation claims is due to be granted.

## V. Conclusion.

In sum, the defendant's motion for summary judgment is due to be granted with respect to the plaintiff's discrimination and retaliation claims under Title VII and the ADEA. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 5th of June, 2003.

L. Scott Coogler
United States District Judge